IAN WALLACH (SBN 237849)
LAW OFFICE OF IAN WALLACH, PC
5777 WEST CENTURY BLVD., SUITE 750
LOS ANGELES, CA 90045
T: 213.375.0000; F. 213.402.5516
iwallach@wallachlegal.com

*Attorney for Defendant*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GOMEZ, *et al*. (HERNANDEZ),<br><br>Defendant. | Case No.: 2:17-CR-00064-3-CAS<br><br>SENTENCING POSITION PAPER<br><br>DATE:  APRIL 16, 2026<br>TIME:   12:00 PM<br>COURT: 8D<br><br>*Before the Hon. Christina A. Snyder* |

TO THE HONORABLE HON. CHRISTINA A. SNYDER, UNITED STATES DISTRICT JUDGE; THE UNITED STATES ATTORNEY'S OFFICE AND ITS ATTORNEY OF RECORD, ASSISTANT UNITED STATES JOHNPAUL LECEDRE; AND/OR REPRESENTATIVES:

SENTENCING POSITION PAPER

1

Defendant, through counsel, submits his Sentencing Position Paper.

Respectfully submitted,

Dated:        April 7, 2026        LAW OFFICE OF IAN WALLACH, PC

By:    _/s/ Ian Wallach_
IAN WALLACH
*Attorney for Defendant*

MEMORANDUM

I.      INTRODUCTION

Over six years ago, in October of 2015 -- Mr. Hernandez, who was then a daily user of methamphetamine -- had been smoking methamphetamine for days. A friend asked him to help "unload a stereo" from a car for a couple of hundred dollars.  Mr. Hernandez soon realized that this job had to do with drugs (not a stereo) but continued to participate.  He was not aware of what drugs were involved.  The delivery of the drugs was stalled for the night. The next day, before attempting to remove the center console of the vehicle that carried the drugs, he was arrested for attempting to unload a substantial amount of methamphetamine from the  central console.

Per the Presentence Investigation Report ("PSR"):

> On January 6, 2022, the Probation Officer interviewed [defendant] by telephone. Defense counsel was also present by counsel. On February 26, 2026, the Probation Officer re-interviewed [defendant] by phone, and verified the additional information with his wife. During his initial interview, [defendant] stated that at the time of the instant offense, he was unemployed and a drug addict. He was asked by someone known as Raymundo to unload drugs from the car, and he agreed. [defendant] went to a residence about half an hour before law enforcement showed up, removed a car stereo and unloaded the car from a car and noticed a lot of drugs in the center console. He has learned a lesson and has since been responsible by providing for his family. In addition, Hernandez provided the following written statement:

> [Defendant] provided the following written statement: "I was a drug addict. I was offered to be paid a few hundred dollars to install a stereo (we were smoking crystal meth while waiting). I realized it was a drug deal and continued moving forward. I was arrested shortly afterwards."

(PSR, ¶ 21).

Mr. Hernandez – who had been a drug addict for years –   is now a different man than he was over ten years ago. He has overcome the substantial hurdles created by his upbringing and drug addiction, reconnected with his wife of 26 years and his children – both of whom are serving in the United States Military. He has been compliant and sober with the terms of his pre-trial supervision and had full-time employment.

And then, in early February of 2025, everything changed. He was detained by ICE. He was deprived access to his wife and family. Everything he built in the five years he spent thriving while on supervised release was taken away. The government refused to assist him and on March 24, 2025 he was deported to Tijuana – unable to spend time with his wife, sons, friends or family members.

Mr. Hernandez lived in the United States since the age of 7. He had no connection to Tijuana, no one to rely on and nowhere to stay. For the first week he found housing at a mission established to assist recent deportees. Then he moved far from Tijuana, took a job at a warehouse, and confined himself to a small 8' x 8' room. Yet he maintained communication with his probation officer and defense counsel. He is once again indigent and without any family support. He is still sober.

This is not a usual situation – his unexpected detention and deportation and resulting pretrial and presentence separation from his wife of 26 years (after getting sober and rekindling their relation), his inability to spend time with his two children with whom he had reformed a tremendous bond, his inability to watch one

SENTENCING POSITION PAPER
4

graduate from military school, and his present existence in living in squalor warrants an even further reduction in his sentence.

Mr. Hernandez asks this Court to consider his minimal involvement in the conspiracy, outstanding rehabilitation, superb performance on pretrial release, the suffering he has already experienced as a result of his ICE detention and subsequent deportation, and other arguments addressed below (which include that his criminal history category overstates his societal danger as it is comprised only of non-violent offenses which, for over 20 years, were the result of his methamphetamine addiction).

This case presents a rare convergence of factors: a minimally involved, fully rehabilitated defendant whose incapacity to even appear for sentencing is a direct consequence of the government's own actions. Based on these factors, Mr. Hernandez seeks a sentence of 15 months, followed by three years of supervised release.

## II.   PROBATION'S RECOMMENDATION

Probation has recommended a downward variance and a sentence of 48 months. (DRL, p. 1) [ECF 484].

## III.   GOVERNMENT'S RECOMMENDATION

The Government has recommended a sentence of 151 months. This appears to be oversight based on a prior Presentence Investigation Report that determined Mr. Hernandez' total offense level to be 29. [ECF 101, ¶ 37]. Yet the applicable amended PSR determined Mr. Hernandez' total offense level to be 25 (PSR, ¶ 39). Using a criminal history category of VI, this results in a low-end sentence of 110

months. (U.S.S.G. Ch. 5, pt. A (Sentencing Table) (offense level 25, CHC VI yields 110 – 137 months)).

It is anticipated that the government will amend its request to comport with the parties' plea agreement which provides:

> The USAO agrees to … Recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range, provided that the offense level used by the Court to determine that range is 24 or higher and provided that the Court does not depart downward in offense level or criminal history category, and subject to any applicable mandatory minimum sentence. For purposes of this agreement, the low end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A.

[ECF 95, ¶ 3(b)].

Should the Government persist in its recommendation of 151 months rather than the low-end of the applicable sentencing Guidelines range, the defense moves to move to set aside the plea agreement.[1] Such a possibility could not have been within Mr. Hernandez' understanding when the plea agreement was signed. Plea

_____

[1] This would revert this matter to pre-plea status, in which case Mr. Hernandez would then move for a dismissal with prejudice in accordance with *U.S. v. Aldana-Aldana*, No. 2:25-MJ-01421-DUTY (C.D. Cal.) (Order of Apr. 15, 2025); *U.S. v. Guillermo Zambrano*, CR 23-524-DMG-5 (C.D. CA) (Order of Feb. 5, 2026); *U.S. v. Monteverde*, Case No. 20-CR-00166- TUC-JCH-JR, 2021 WL 5534880 (D. Ariz.) (Order of Oct. 7, 2021); *U.S. v. Ferreira-Chavez*, Case No. 1:20-cr-00145-BLW, 2021 WL 602822; (D. Idaho) (Order of Feb. 12, 2021); *U.S. v. Munoz-Garcia*, 455 F. Supp. 3d 915 (Case No. CR-19-01670-001-TUC-JGZ (EJM) (D. Ariz. 2020); *U.S. v. Trujillo- Alvarez*, 900 F. Supp. 2d 1167 (Case No. 3:12-CR-00469-SI) (D. Or. 2012).

agreements are contracts and the government is held to the literal terms of the agreement. *Ambiguities are construed in favor of the defendant. United States v. Camarillo-Tello*, 236 F.3d 1024, 1026-27 (9th Cir. 2001) (*emphasis added*) (citing *United States v. Johnson*, 187 F.3d 1129, 1134 (9th Cir. 1999), *United States v. De la Fuente,* 8 F.3d 1333, 1338 (9th Cir. 1993). In fact, the "core question" guiding the analysis is "whether the government's conduct [was] inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." *United States v. Thung Van Huynh*, 884 F.3d 160, 166 (3d Cir. 2018) (quoting *United States v. Nolan-Cooper*, 155 F.3d 221, 236 (3d Cir. 1998). In this instance, the government agreed to seek the low-end of the guidelines range if Probation determined the Total Offense Level to be 24 or higher. Probation determined the applicable guidelines range to be 25 and the government did not object to that finding. Accordingly, the highest sentence that the government may seek is 110 months.  And a recommendation above 110 months would not merely be inconsistent with the plea agreement—it would constitute a material breach.

If the government seeks any sentence above that, it breaches the plea agreement, and this Court should grant Mr. Hernandez' demand to set it aside. *Buckley v. Terhune,* 441 F.3d 688, 699 (9th Cir. 2006).

IV.    STATEMENT OF NON-OBJECTIONS TO PSR

Mr. Hernandez has no objections to the calculations contained in the PSR.

V.    FACTUAL BASIS

Mr. Hernandez agrees that the factual basis contained in the parties' plea agreement is accurate. [ECF 95, ¶ 12].

## VI.    ATTENDANCE AT SENTENCING

The defense previously informed the Court that it was Mr. Hernandez' intent to return for sentencing. At the time this submission is being authored, defense counsel does not know whether or not Mr. Hernandez will be in attendance for the sentencing hearing.

In the event that Mr. Hernandez is not present, the Court may, should it determine that Mr. Hernandez' absence is voluntary, factor that into a sentence in support of an upward variance.

But any absence is not "voluntary". The government's efforts to return Mr. Hernandez comprised (a) obtaining approval for Customs and Border Protection ("CBP") parole, and forwarding a document related to that approval to defense counsel on September 29, 2025 allowing Mr. Hernandez to enter the United States at the San Ysidro port of entry only (Declaration of Ian Wallach ("Wallach Dec."), ¶ 2 (Exhibit A)) and a subsequent email on April 1, 2026 forwarding a document allowing Mr. Hernandez to enter the United States at any port of entry on April 6, 2026. (Wallach Dec., ¶ 3, (Exhibit B).

Defense counsel complied with Cal. R. Prof. Conduct R. 1.4 ("Rule 1.4").[2] But communicating information relayed by the government is one thing – taking

---

[2] Cal. R. Prof. Conduct Rule 1.4 provides as follows:

(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which disclosure or the client's informed consent* is required by these rules or the State Bar Act;
(2) reasonably* consult with the client about the means by which to accomplish the client's objectives in the representation;

additional actions to effectuate the government's desires is another. The government deported Mr. Hernandez to Tijuana. The government is aware from prior proceedings that Mr. Hernandez does not live in Tijuana. While the government obtained internal permission for Mr. Hernandez to return and forwarded a document to defense counsel, its efforts stopped there. The government did not, for example, provide Mr. Hernandez – an indigent defendant who had been appointed CJA counsel – funds or lodging necessary to travel to San Ysidro (in October, 2025) or a port of entry (in April 2025). And it is not within defense counsel's obligations to (a) make such arrangements for Mr. Hernandez to arrive at these ports of entry; (b) personally provide and deliver funds to Mr. Hernandez (who does not live in Tijuana) or make arrangements for the travel and lodging necessary for him to arrive at the ports of entry. Nor would defense counsel know how to accomplish these tasks. And it is not defense counsel's duty

---

(3) keep the client reasonably* informed about significant developments relating to the representation, including promptly complying with reasonable* requests for information and copies of significant documents when necessary to keep the client so informed; and

(4) advise the client about any relevant limitation on the lawyer's conduct when the lawyer knows* that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably* necessary to permit the client to make informed decisions regarding the representation.

(c) A lawyer may delay transmission of information to a client if the lawyer reasonably believes* that the client would be likely to react in a way that may cause imminent harm to the client or others.

(d) A lawyer's obligation under this rule to provide information and documents is subject to any applicable protective order, non-disclosure agreement, or limitation under statutory or decisional law.

SENTENCING POSITION PAPER

9

under to Rule 1.4 to (a) personally provide these funds; (b) find some means to transfer these funds to Mr. Hernandez; (b) petition the government for assistance in providing such funds and arranging such travel (and find and effectuate a means to deliver these funds to Mr. Hernandez); (c) seek authorization for CJA funding for such tasks (and find and effectuate a means to deliver these funds to Mr. Hernandez' (d) petition this Court for such funds; (and find and effectuate a means to deliver these funds to Mr. Hernandez); (e) make arrangements for Mr. Hernandez' travel and lodging for his travel to the relevant ports of entry; or (f) otherwise effectuate Mr. Hernandez' timely arrival at the relevant port of entry. Nothing in the Rules of Professional Conduct or statutory or constitutional law imposes such a duty. And imposing the duty to accomplish these tasks effectively renders defense counsel an agent of the government, an event that is precluded by law and ethical rules. "The Sixth Amendment right to effective assistance of counsel includes 'the right to be represented by counsel whose loyalties are undivided.'" *United States v. Marshank*, 777 F. Supp. 1507, 1525 (N.D. Cal. 1991) (citing *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir. 1979), cert. den., 446 U.S. 964 (1980); *Cuyler v. Sullivan*,446 U.S. 335, 348 (1980)).[3]

The government had several opportunities to secure Mr. Hernandez' attendance. It could have contacted ICE and stayed Mr. Hernandez' deportation. Upon information and belief, the government could have issued a detainer on Mr.

---

[3] The defense presently makes this argument in the context of a potential sentencing *in absentia*. The defense has previously made this argument in the context of its prior motion to dismiss this matter. The defense's limitation of this argument to its effect on sentencing in this pleading is not meant to function as a waiver of this same argument in the context of dismissal.

Hernandez precluding his deportation. The government could have brought a writ to bring Mr. Hernadez to this Court and explained, or have the Court explain, to Mr. Hernandez how to return for trial and/or sentencing and provided him with the means to do so. It did not. The government's decision to deport Mr. Hernandez while this case was pending was a profound error – one that negatively impacted, substantially, all parties and the Court in their capacity to fulfill statutory and constitutional obligations. But the mistake was not that of Mr. Hernandez and, should he fail to appear for sentencing, any absence should not be to his ultimate detriment.

Mr. Hernandez performed flawlessly while on pretrial supervision. There is no reason to believe that – but for the deportation – Mr. Hernandez would not be present for sentencing. Should he fail to appear, his absence is the fault of the government, and should not be considered as grounds for an upward variance.

Even if the Court were to disagree with any individual component of this analysis, the undisputed fact remains that Mr. Hernandez did not place himself outside the Court's reach—the government did.

## VII.   MR. HERNANDEZ' EARLY ACCEPTANCE OF RESPONSIBILITY.

Mr. Hernandez did not waste the government's or Court's time or resources in drawing out this prosecution. On one hand, his codefendant's denied responsibility and carried the matter to trial. Mr. Hernandez, however, wasted no one's time. He was arraigned on December 8, 2020 [ECF 69] and released on January 7, 2021. [ECF 85] He obtained his pre-plea report in September of 2021. [ECF 91]. And two months later, less than a year after being arraigned, he accepted responsibility for his actions and signed the plea agreement. [ECF 95]. A change of

plea was entered on December 8, 2021 – less than one year from the date of his arraignment.

Each of the remaining defendants contested culpability through 2025. By contrast, Mr. Hernandez immediately took responsibility for his actions and saved the Court and parties tremendous resources.  This is another reason why a substantial downward variance is warranted.

## VIII.  MR. HERNANDEZ' DEPORTATION

Mr. Hernandez has been in the United States since the age of 7. He has no memory of his childhood in Mexico. PSR ¶ 68. For the five years prior to his unexpected deportation, he lived in Fontana, California with his wife and sons, having reformed his relationships with them following the sobriety he finally achieved in 2020. He performed perfectly on pretrial supervision and never once tested positive for drugs.

Then, in early February of 2025, he was detained by ICE.  He reached out whenever he could to defense counsel in his attempt to obtain some relief from the Department of Justice, but none came. After seven weeks of detention, five ICE officers restrained him and forced his fingerprint, forced him into a van, drove him to Tijuana, and left him there without any means to survive or protect himself.

Mr. Hernandez spent one week at a mission established to assist deportees before leaving Tijuana. Eventually he was able to obtain a low-paying warehouse job and rent a 10' by 10' room where he spends all of his time while not working, and describes his confinement a "living in a different type of prison." He no longer has the company of his wife of 26 years. He cannot see his sons – both of whom

are proudly serving in the United States Military. He missed one son's graduation from military school. He has no physical contact with friends or family.

Mr. Hernandez has suffered tremendously as a result of his deportation while this matter was pending, and a substantial downward variance is warranted.

IX.    MR. HERNANDEZ' CRIMINAL HISTORY IS NOT REFLECTIVE OF WHO HE IS OR THE DANGER HE POSES TO THE COMMUNITY

Mr. Hernandez has a Criminal History Category of VI. (PSR, ¶ 56). This suggests that he is most dangerous type of offender. But an examination of his offenses shows otherwise. His convictions are as follows:

- An October 2005 conviction for being under the influence of a controlled substance, possession of a controlled substance, and possession of a knife. PSR ¶ 47;

- A 2006 conviction for driving on a suspended license and speeding. PSR ¶ 48;

- A 2008 conviction for driving on a suspended license. PSR ¶ 49;

- A 2010 conviction for possessing methamphetamine. PSR ¶ 50;

- A 2013 conviction for possessing methamphetamine for sale. PSR ¶ 52; and

- A 2019 conviction for transporting methamphetamine for sale. PSR ¶ 51.

These are not violent crimes. They are the type of crimes associated with non-violent drug addicts.

SENTENCING POSITION PAPER

13

In *United States v. Reyes*, 8 F.3d 1379, 1383 (9th Cir. 1993) the Court stated that "there may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history . . . . The court may conclude that the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category . . . and therefore consider a downward departure from the guidelines". This is such a situation.

Mr. Hernandez does not dispute that his criminal history is serious – it is. But his past conduct is materially different from that of most defendants who have the same Criminal History Category. It lacks violent crimes. The serious crimes committed during his adulthood are the result of his drug addiction. His crimes were acquisitive, non-violent, low-yielding and consistent with the conduct of one impaired by a meth addiction.

Newly-emerging research establishes the link between extensive methamphetamine use and property and fraud crimes[4] – exactly the criminal

---

[4] *See* R. McKetin, J. Boden, *et al.* "The contribution of methamphetamine use to crime: Evidence from Australian longitudinal data, Drug and Alcohol Dependence, Volume 216, 2020" (https://doi.org/10.1016/j.drugalcdep.2020.108262) (last accessed Mar. 25, 2026) (providing robust evidence that methamphetamine use is associated with a large increase in the likelihood of crime, with participants five times more likely to report crime during periods of use); Goldsmid S & Willis M 2016., "Methamphetamine use and acquisitive crime: Evidence of a relationship". Trends & issues in crime and criminal justice no. 516. Canberra: Australian Institute of Criminology. https://doi.org/10.52922/ti149987 (last accessed March 25, 2026) (finding that meth and heroin uses are, respectively, 4.5 and 4 times more likely to commit acquisitive crimes than non-users); M. Gizzi & P. Gerkin, Methamphetamine Use and Criminal Behavior, 54 Int'l J. Offender Therapy & Comp. Criminology 915 (2010) (meth users far more likely than users of other drugs to commit

conduct that Mr. Hernandez engaged in during meth addiction. While this does not excuse his past conduct, it is a strong indicator that his current established sobriety greatly reduces any societal risk that he may pose.

This is precisely the type of case in which Criminal History Category VI overstates both past culpability and future risk.

## X.    MR. HERNANDEZ' LIFE AND CHARACTER

The following information is derived from the PSR and interviews with the defendant and his wife of 26 years.

### a.  Mr. Hernandez' Background, Drug Use, And Recovery

At present, Mr. Hernandez is a sober, loving father and husband.  And Mr. Hernandez was an excellent employee. Letters from his family members and former employer have been separately submitted and tell the story of a man who has rehabilitated, maintained sobriety for over 6 years, reformed meaningful relationships with his wife and children, and was a steadfast and standout employee.

Additionally, Mr. Hernandez has had no violations while on pre-trial supervision.

---

property crimes); Northwest High Intensity Drug Trafficking Area, Methamphetamine and Related Crime: The Impacts of Methamphetamine Abuse 12 (Mar. 2006).

But Mr. Hernandez's life story is a tragic one. He encountered substantially more difficult challenges than most will face in a lifetime.

Mr. Hernandez was born October 4th, 1978. His mother was only 16 years old.  His birth was the disturbing product of his mother being sold to a man 30 years her senior. (PSR, ¶ 68). The elderly man ultimately returned Mr. Hernandez' mother to her family, where she was considered a disgrace by Mr. Hernandez's grandfather. *Id.*

Mr. Hernandez grew up without a father.  He was brought into the United States at the age of 7. At that time, he lived in Pomona with his mother, younger brother, and stepfather. His stepfather was violent and would beat Mr. Hernandez and his younger brother (including punching them in the head) and abuse them mentally. (PSR, ¶ 68). When he was in the tenth grade he fought back against his stepfather, who, in response, kicked him out of the family home. (PSR, ¶ 70). As a result, Mr. Hernandez, at a young age, moved to the streets to avoid being home, which was a place where he felt that nothing he did was good enough to warrant his family's love. He was eventually allowed to live with Aunt Maria.

In High School, Mr. Hernandez began to smoke marijuana and this led to his initial experimentation with methamphetamine. Although he had fallen into a bad crowd, he felt like he belonged -- no one judged him or hurt him.

Mr. Hernandez eventually left school. Because of his lack of success and his stepfather's badgering, he felt like a failure.  Using drugs made him forget how he perceived himself.

Because of his drug use, Mr. Hernandez was jailed several times -- first when he was about 23 years old for possession of a meth pipe. He recalls serving three months and being released on a work program that he completed.

Mr. Hernandez moved to Fontana in 2010. He could not keep steady employment due to his drug abuse.  By this time he had a family and wanted to provide, but was heavily addicted to drugs. He was offered what he thought were opportunities for easy money and did what he thought was necessary to feed his family, while continuing and supporting his drug abuse.

In 2000, he met his wife Blanca, and they have remained married since that time and remain so today. Due to his deportation, he has not seen her since 2025.

After their marriage, once his drug use became intolerable, his wife Blanca made several attempts to get him into a drug treatment program, but he was both in denial and heavily addicted and refused.  At this point he was using so heavily addicted that he was losing his family, but the hurt only contributed to greater drug use, which led to more incarceration.

In custody, his desire to do drugs was painful.  He became angry and had suicidal ideations. His family was sick of him and didn't want to help.  He felt abandoned.

It was at this time when Mr. Hernandez began to read the bible. He found religion and began to find peace with himself.  He no longer needed drugs.  He asked his family for forgiveness and wanted them to know that he had changed and did not want to lose them. He missed his sons and did not want them to grow up without a father like he had. So he tried to better himself – getting a job at the jail kitchen and getting his culinary certificate. He was proud of his work. He wanted his family back and felt as though God had given him a second chance to make it right.  He no longer used or wanted to use drugs – he just wanted to see his sons. His oldest son graduated and he wasn't there to see it. Mr. Hernandez missed so many moments -- birthdays, holidays, and special moments in their life. Still, he

felt as though God had a purpose for him. He has lived an exemplary life (for the first time since his teenage years) while on pretrial supervision.

   b. *How Mr. Hernandez Became Involved In The Present Matter*

Back in 2015, Mr. Hernandez found a part time job as a handyman fixing offices and buildings. That is where he met a colleague referred to herein as "H". They would get high together, sometimes at job sites. Mr. Hernandez thought of H as a good friend. Mr. Hernandez made another friend, referred to herein as "R", who also used drugs and they would use together.

"R" offered Mr. Hernandez a quick cash job to fix a car stereo, and he agreed to do so for a few hundred dollars. But soon Mr. Hernandez realized, after hearing calls being made that were related to drugs, that something else was happening. When Mr. Hernandez confronted "R" about this, "R" conceded that it was a drug job. Mr. Hernandez, who had been smoking methamphetamine for days, agreed to continue assisting.

The delivery of the car was delayed one night. The next day, Mr. Hernandez directed "R" to a garage. Mr. Hernandez was arrested before attempting to unload drugs from the center console of the car.

He never negotiated any price or sought a substantial monetary benefit. He never connected any buyers to sellers. He never agreed to or attempted to sell the drugs at issue. He never attempted to purchase drugs. And he never even partook in the task that he agreed to – removal of the drugs from the car's central console.

But he did agree to do so. And he did direct the driver of the car with the drugs into a garage. And he did all of this at the end of a methamphetamine bender.

This is not a case where one is driven to sell drugs to make large amounts of money.  It is not a case where one organizes the transport or delivery of drugs. His minimal participant reduction in the PSR reflects his minimal conduct in the conspiracy, providing sound support for a downward variance.

While his conduct is both grave and serious, it is conduct of one more akin to that of a drug addict that that of a drug dealer in the general commercial sense (the latter being that which is targeted by 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii), the applicable statutes). This is an additional ground supporting a substantial downward variance.

### c.  *Mr. Hernandez's Conduct During Pretrial Release*

Mr. Hernandez never violated the terms of his pre-trial supervision. He obtained a full-time job. He got a driver's license with no restrictions. He completed a three-month drug and alcohol program. He witnessed one son become a United States Marine at the age of 19 with a future that holds great promise. His sons (both of whom are now in the military) make him terribly proud now.  And he is an excellent father.

Following his deportation he did something outstanding – he kept in contact with his defense counsel and probation officer. He continues his life of sobriety and employment. Simply put, Mr. Hernandez is not the man he once was back in 2015.

## XI.   A SENTENCE OF 15 MONTHS SATISIFES THE FACTORS SET FORTH IN 18 U.S. CODE § 3553

Mr. Hernandez understands that he is seeking a substantial departure. However, in light of the conditions that led to his conduct in the current offense, his minor involvement, the amount of time that has passed, his conduct while on pre-trial supervision, and, most importantly, the suffering he has experienced and as a result of his presentence deportation, a sentence of 15 months comports with the 3553(a) factors.

While the requested departure is a substantial deviation from both the Guideline's range and the recommendation of the Department of Probation, it is still a severe punishment in light of Mr. Hernandez's conduct. He was a drug-addict who, in less than a day, went from realizing he was being a part of a drug-conspiracy to being arrested -- with his culpable conduct being that he directed a driver to a garage. He has endured the loss of physical contact with his wife, sons, friends and family members. His suffering is one no person should experience.

He has been punished enough, yet he still seeks a sentence of 15 months. This request is reasonable in light of his rehabilitation, minimal involvement, the overstatement of his criminal history category, and the suffering that arose from his unexpected presentence detention and deportation.

### a.   The Nature And Circumstances Of The Offense And The History And Characteristics Of The Defendant

Mr. Hernandez understands that the offense is serious and that a substantial punishment is warranted.  But in the present case, the Court should consider the events that brought him here. He was a minor player and a drug addict with no idea about the type or amount of drugs at issue. He is now clean. His family ties are

now strong and he has a job with a supportive employer. He is no longer the man he once was.

b.  A Sentence Of 15 Months Reflects The Seriousness Of The Offense, Promotes Respect For The Law, And Provides Just Punishment

Mr. Hernandez understands the harm of methamphetamine and that it has a brutal effect on our society. But this must be balanced against the hardships he suffered that led to his involvement, his unexpected and premature removal from access to his sons and family, and his deportation to a country to which he has no ties and lives a life in squalor under an assumed name and identity.

Considering these facts, a sentence of fifteen months of incarceration is substantial and promotes respect for the law and provides just punishment.

c.  A Sentence Of 15 Months Provides An Adequate Deterrence To Criminal Conduct

The Court is aware of the impact that a year and a half of incarceration will have on someone's life. Such a sentence is exceptionally damaging to one's family and support network. It is a sentence that would deter anyone – especially those in the situation that Mr. Hernandez finds himself in – from engaging in such conduct.

d.  A Sentence Of 15 Months Protects The Public From Further Crimes Of The Defendant

A sentence of 15 months protects the public from a drug addict who was involved in attempting to unload drugs from a car, not involved in sales or negotiations or locating purchasers or buyers, and who ultimately and fully

rehabilitated. He poses no risk to society at all. And this is compounded by his deportation. It is not possible for him to be a societal risk when he is no longer a member of this society.

e. During His Incarceration, Mr. Hernandez Will Continue To Seek The Training And Care He Needs To Live A Lawful Life

Despite everything he has experienced, Mr. Hernandez is committed to strengthening the tools that will allow him to start living a law-abiding life.  He has been completely sober while on pre-trial supervision and found lawful employment in Mexico.  He developed and mastered the tools that allow him to maintain the conduct he has shown during his period of pre-trial supervision.

## XII.   HOUSING RECOMMENDATIONS

Mr. Hernandez seeks to be housed in an environment where he can continue to address his alcohol and drug addictions, continue to learn life-skills, and be close to the family with whom he is so close. Mr. Hernandez therefore respectfully requests that the Court make the following recommendations to the BOP:

1. That Mr. Hernandez be housed in a BOP facility that offers the RDAP program, and that the location be in the Southern California are due to strong family ties.

2. That the BOP evaluate Mr. Hernandez for participation in the BOP's RDAP Program; and

3. That the BOP permit Mr. Hernandez to participate in the First Step Act Programs that the BOP has available.

XIII.  CONCLUSION

Mr. Hernandez is not asking this Court to overlook his conduct. He is asking the Court to recognize what has happened since—who he has become, what he has endured, and the role the government itself played in bringing him to this position. A sentence of 15 months is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

Date:  April 7, 2026

LAW OFFICE OF IAN WALLACH, PC

By     */s/ Ian Wallach*
IAN WALLACH
*Attorney for Defendant*