TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
JOHNPAUL LECEDRE (Cal. Bar No. 303100)
Assistant United States Attorney
Post-Conviction and Special Litigation Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4447
    Facsimile: (213) 894-0142
    E-mail:  johnpaul.lecedre@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:17-cr-00064-CAS-3 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM REGARDING DEFENDANT JAVIER HERNANDEZ |
| v. | |
| ESMERALDA GOMEZ, et al., | Date:       April 16, 2026 |
| JAVIER HERNANDEZ aka "Francisco Iniguez" (#3) | Time:       10:00 AM Location: Courtroom of the Hon. Christina A. Snyder |
| Defendants. | |

Plaintiff, UNITED STATES OF AMERICA, by and through its counsel of record, the United States Attorney's Office for the Central District of California and Assistant United States Attorney JohnPaul LeCedre hereby files its Revised Sentencing Memorandum for defendant JAVIER HERNANDEZ ("Defendant"). This Revised Sentencing Memorandum is filed in light of the Revised Presentence Investigation Report ("RPSR"), disclosed on March 2, 2026. (Dkt. 485.) The government's prior sentencing memorandum, filed September 29, 2025, (Dkt. 440),

i

was based on the original 2022 PSR and is hereby superseded, withdrawn and no longer operative. The Court need not consider it.

The government's recommendation is **100 months' imprisonment** – the low end of the advisory Guidelines range as calculated in the RPSR, and the ceiling the government may seek under the parties' plea agreement, followed by a 5-year term of supervised release, and a $100 special assessment. The government accepts the RPSR's calculations without objection. This sentence is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

This Sentencing Memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, and any such further evidence and argument as the Court may permit at the sentencing hearing.

Dated: April 13, 2026                    Respectfully submitted,

                                         BILAL A. ESSAYLI
                                         First Assistant United States
                                          Attorney

                                         ALEXANDER B. SCHWAB
                                         Assistant United States Attorney
                                         Acting Chief, Criminal Division


                                          /s/ *JohnPaul LeCedre*
                                         JOHNPAUL LECEDRE
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

ii

**TABLE OF CONTENTS**

**I.   INTRODUCTION**.................................................................1

**II.  BACKGROUND**...................................................................3

    A.   Offense Conduct..........................................................3

    B.   Defendant's Criminal History.............................................4

    C.   Procedural History.......................................................5

**III. GUIDELINE CALCULATIONS**......................................................7

    A.   The Revised Guidelines Calculation.......................................8

    B.   Safety Valve.............................................................8

    C.   The Plea Agreement Ceiling...............................................9

    D.   The Guidelines Range Already Reflects Full Mitigation....9

**IV.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**...............................10

    A.   Nature and Circumstances of the Offense (§ 3553(a)(1))...10

    B.   History and Characteristics of Defendant (§ 3553(a)(1)).................................................13

    C.   Need for Just Punishment and Respect for the Law (§ 3553(a)(2)(A))......................................17

    D.   Deterrence and Protection of the Public (§ 3553(a)(2)(B))......................................19

    E.   Protection of the Public (§ 3553(a)(2)(C)).............20

    F.   Avoiding Sentence Disparities (§ 3553(a)(6)).............20

**V.   RESPONSE TO DEFENSE SENTENCING POSITION**.....................................21

    A.   Preliminary Note: The Cooperation Narrative Is Public....21

    B.   Four Years, Two Stories, One Defendant...................23

    C.   The Guidelines Have Credited Every Available Mitigation............................................24

    D.   The Deportation Circumstances Do Not Warrant a Variance..............................................25

    E.   The § 5K1.1 Argument Fails And the Threat Was Non-Credible.............................................26

    F.   Defense's Repeated Disclaimers of Responsibility.........29

VI.   PROCEDURAL POSTURE IN CASE OF NON-APPEARANCE...................30

VII. RESERVATION OF THE GOVERNMENT'S RIGHT TO DECLARE BREACH.......30

VIII.      GOVERNMENT'S RECOMMENDATION AND CONCLUSION...............30

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>[1]

**I.    INTRODUCTION**

Javier Hernandez ("Defendant") is a three-time convicted methamphetamine trafficker who has never been lawfully present in the United States.

He was convicted of trafficking methamphetamine for sale in 2013. Two years later – while on probation for that conviction – he conspired in the instant offense to unload more than six kilograms of methamphetamine tested at 100% purity from a false compartment inside an Audi A4, as part of an organized narcotics operation connected to a Mexican transnational criminal organization. Then, after being arrested for the instant offense, he committed a third serious trafficking offense – possessing and transporting over 27 pounds of methamphetamine for sale. When officers arrested him in 2019, he gave a false name, freed himself from handcuffs, and fled.

Three convictions. Three separate decisions to flood American communities with massive quantities of methamphetamine. Probation did not stop him. Prior incarceration did not stop him. Arrest in this very case did not stop him. Nothing has stopped him except for a jail cell.

Every pre-sentence motion filed by Defendant – to dismiss the indictment, to set aside the plea agreement, and to reconsider – has been denied. His own counsel declared in February that he would

---

[1] Defendant requested and received permission from the Court to file a brief not to exceed 30-pages. (Dkts. 491, 494.) Defense counsel and the government met and conferred prior to that filing and agreed that there would be no objection, provided that Defense agreed to a reciprocal size for the government. The government thus requests that the Court permit the length of the instant filing.

return voluntarily for sentencing. The only thing left is the sentence itself.

The Sentencing Guidelines – already revised downward to account for his "minor role," his safety valve eligibility, and his acceptance of responsibility – produce an advisory range of 100 to 125 months. The government asks for 100 months: the low end, the floor, and the maximum it may seek under the plea agreement. It is the most restrained recommendation this record could permit.

Defendant asks for 15 months. He asked for 60 months in 2022, when the Guidelines range was 151 to 188 months. The Guidelines range has since dropped by more than 50 months at the low end – every bit of that reduction attributable to changes in the law that had nothing to do with anything this defendant did or did not do. And yet Defendant's ask has been dropped by an additional 45 months on top of that, from 60 to 15 months. The facts of the offense have not changed. Defendant's criminal history has not changed. What changed is the narrative: Defendant, who in 2022 described himself as a passive drug addict who stumbled into a deal for a few hundred dollars, is now recast as a courageous cooperator living in hiding from cartel cooperation. And it is billed as entirely the government's fault, demanding a sentence that amounts to time served. The record does not support that narrative. The Court has already ruled against it. The law does not reward it.

Defendant's recent sentencing position is a study in strategic reinvention. It asks this Court to ignore three trafficking convictions and instead focuses on the circumstances of a deportation that this Court has already found to be lawful, foreseeable, and the direct consequences of Defendant's own conduct. (Dkt. 478.) It

2

invokes cooperation credit for assistance that was never provided, at a trial where defendant never testified. It recycles the same "non-violent addict" characterization that appeared word-for-word in the 2022 memo – and then applies it to a defendant whose 2019 conviction involved 27 pounds of methamphetamine, cash, escape from handcuffs, and flight from the police. And it asks for a sentence so far below Guidelines range that it would be an outlier for a first-time offender, let alone a career trafficker on his third serious drug conviction.

The § 3553(a) factors point in one direction. This Court should sentence Javier Hernandez to 100 months should he present himself at sentencing at the April 16, 2026 court hearing date.

## II.   BACKGROUND

### A.   Offense Conduct

In and around October 2015, in Los Angeles County, Defendant agreed with co-conspirators to possess approximately six kilograms of methamphetamine, a Schedule II controlled substance, for the purpose of distribution. On or about October 16, 2015, Defendant and an alleged coconspirator, Raymundo Lugo Martinez ("RM"), used another alleged co-conspirator's, Henry Quijada's ("HQ"), garage, located at 15552 Elaine Drive, in Fontana, California, to unload the six kilograms of methamphetamine from a false compartment inside an Audi A4. Defendant and RM directed the driver of the Audi A4 containing the load of methamphetamine to drive the vehicle into the garage of the residence and to enter the home to wait for Defendant and RM to empty the false compartment. Defendant and RM attempted to open the false compartment, which was located beneath the center console of the vehicle. The false compartment contained 18 packages of

3

methamphetamine totaling approximately 6,169 grams that tested 100% pure. (Dkt. 95 ¶ 15; RPSR ¶ 17.)

Defendant carried out the aforementioned conduct at the direction of another co-conspirator, Esmeralda Gomez ("EG"), who would recruit and hire drivers to travel to Mexico, pick up vehicles loaded with controlled substances, and drive the vehicles to the United States, where Defendant and co-conspirator 1 would retrieve the drugs. (RPSR ¶ 18.) This was not a street-level transaction or the errand of a passive bystander. It was a coordinated, cross-border narcotics operation connected to a Mexican supply chain, and Defendant was the man on the ground, trusted to receive and unload wholesale quantities of 100% pure methamphetamine.

Defendant's own account, provided at his presentence interview in 2022, was that he was "a drug addict" who "realized it was a drug deal and continued moving forward." (RPSR ¶ 21.) That account – offered to minimize – nonetheless confirms what the plea agreement establishes: Defendant knew exactly what he was doing, made the choice to do it, and did it as part of an organized operation, not an impulse.

**B.   Defendant's Criminal History**

The instant offense does not stand alone. It is the middle chapter of a twelve-year trafficking career.

In 2013, Defendant was convicted of felony possession of a controlled substance for sale in San Bernardino County. (RPSR ¶ 52.) He gave the arresting officer a false name – "Demetrio Gonzalez." (Ex. 1.) He received 36 months' probation. Two years later, while still on that probation, he committed the instant offense. (RPSR ¶ 55.)

4

In 2019, after his arrest in this case, while this case was pending, Defendant was arrested again. On May 29, 2019, California Highway Patrol officers stopped his vehicle and discovered 27 packages of methamphetamine totaling approximately 27 pounds in the trunk, along with $1,174 in cash on his person. (Ex. 2.) When officers attempted to take him into custody, defendant gave a false name – this time "Miguel Hernandez Nava" – freed himself from handcuffs, and fled the scene. (Id.) He was apprehended, prosecuted, and convicted of felony transportation and sale of a controlled substance, receiving three years' county jail and four years' supervision. (RPSR ¶ 53.)

Defendant's first conviction did not deter the second. The second did not deter the third. The third was committed while this case was pending. No intervention – probation, prosecution, or otherwise – has broken the pattern.

**C.    Procedural History**

On February 3, 2017, the government filed a three-count indictment against Defendant and three co-defendants. On December 8, 2021, Defendant entered a guilty plea to Count 1 – conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii). (Dkt. 99.) On January 31, 2022, the original PSR was disclosed, calculating a Total Offense Level of 29, Criminal History Category VI, and an advisory Guidelines range of 151 to 188 months. (Dkt. 101 (the "PSR").)  Defendant filed a sentencing position paper that was later withdrawn at his request. (Dkts. 102, 112.) Defendant subsequently entered into a cooperation agreement and sentencing was continued to allow him to provide substantial assistance, including trial testimony. In early 2025, the

co-defendants' jury trial was ultimately continued to August of 2025, (Dkt. 160), and Defendant's sentencing hearing was continued to October 6, 2025. (Dkt. 162.)

On February 19, 2025, Defendant was detained by U.S. Immigration and Customs Enforcement and detained at the Desert View Facility in Adelanto, California. (RPSR ¶ 64.) On March 24, 2025, he was deported to Mexico. (Id.) On April 1, 2025, Pretrial Services confirmed Defendant's deportation and advised both defense counsel and the government. (Dkt. 171.)

In August of 2025, co-defendants RM and HQ were acquitted following jury trial. (RPSR ¶ 11.) The government provided Defendant with Significant Public Benefit Parole ("SPBP") prior to jury trial, which gave him temporary lawful entry into the United States to testify at trial. (Dkts. 374, 375.) Defendant did not testify.

On September 29, 2025, the government filed its original sentencing memorandum, recommending 151 months based on the original PSR. (Dkt. 440.) That memorandum is superseded by this filing. On November 24, 2025, the Court denied Defendant's motions to dismiss and to set aside the plea agreement (Dkt. 478), filed originally on April 17, 2025 (Dkt. 170) and supplemented significantly thereafter. The Court found that Defendant's deportation was a foreseeable, lawful consequence of his own conduct explicitly addressed in the plea agreement and Rule 11 colloquy; that the government had not breached the plea agreement; that the parole process constitutes a sufficient remedy for any impact on Defendant's rights at sentencing; and that defense counsel is ethically obligated to inform Defendant of the parole opportunity and sentencing date. (Id. At pp. 6-7, 11 n.8.)

On February 3, 2026, Defense counsel declared that defendant "has made the voluntary choice to return to the United States for sentencing." (Dkt. 481 at p. 3, ¶ 4.)

On March 23, 2026, Defendant filed an untimely motion for reconsideration and clarification. (Dkt. 487.) The Court denied the motion, indicating that it was untimely and without merit.

On March 2, 2026, the RPSR was disclosed, reflecting updated Guidelines calculations under the November 1, 2025 edition of the Sentencing Guidelines: Total Offense Level of 25, Criminal History Category of V, and an advisory range of 100 to 125 months. (Dkt. 485.) The government accepts these calculations without objection.

Sentencing is scheduled for April 16, 2026.

**III. GUIDELINE CALCULATIONS**

The government accepts the calculations set forth in the RPSR, disclosed on March 2, 2026, without objection. (Dkt. 485.) Those calculations, applying the November 1, 2025 edition of the Sentencing Guidelines, are as follows:

- Base Offense Level (§2D1.1): 32, based on 6,169 grams of methamphetamine (actual, 100% purity)
- Specific Offense Characteristics: Safety Valve (§2D1.1(b)(18)): -2
- Role Adjustment (§3B1.2(b)): -2, for minor role
- Acceptance of Responsibility (§3E1.1): -3
- TOTAL OFFENSE LEVEL: 25

The PSR calculates Defendant's Criminal History as Category V. (RPSR at p. 3.)

## A.   The Revised Guidelines Calculation

The RPSR reflects two significant changes from the original 2022 PSR. First, the November 1, 2025 edition of the Guidelines reduced the base offense level applicable to defendant who receive a mitigating role adjustment under §3B1.2, pursuant to the interaction between § 2D1.1(a)(5)(ii) and § 3B1.2. (RPSR Addendum.) This reduced the base offense level from 34 to 32. Second, the 2025 Guidelines amended § 4A1.1(e) to eliminate "status points" for defendant six or fewer criminal history points, and to reduce them by one point for defendants with seven or more. Id. Applied here, defendant's criminal history score of 12 – down from 13 in the prior calculation – places him in Criminal History Category V, rather than Category VI. (RPSR ¶ 56.) The resulting advisory range is 100 to 125 months. (RPSR at p. 3.)

These are not adjustments defendant has earned. They are the product of policy changes by the Sentencing Commission that happened to benefit him. The Guidelines have done everything in their power to reduce his exposure. The resulting range of 100 to 125 months already accounts for every mitigating factor baked into the Guidelines structure.

## B.   Safety Valve

The parties stipulated in the plea agreement that Defendant meets the safety valve criteria of U.S.S.G. § 5C1.2(a)(2)-(4). (Dkt. 95, ¶ 15.) In October of 2023, the previously assigned AUSA confirmed that Defendant qualifies for safety valve under the five criteria of § 5C1.2. (Dkt. 486 at p. 1.) Accordingly, Defendant is not subject to the 10-year mandatory minimum term of imprisonment. The safety valve

8

has been applied and is reflected in the RPSR and total offense level. The government does not contest it.

### C.    The Plea Agreement Ceiling

Pursuant to the parties plea agreement, the government agreed to recommend a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range, provided that the offense level used by the Court is 24 or higher and that the Court does not depart downward in the offense level or criminal history category. (Dkt. 95, ¶ 3(b).) Probation has calculated the Total Offense Level at 25 – above the plea agreement threshold – and the government has not objected to that calculation. The government's recommendation is therefore capped at the low end of the range: **100 months.**

The government notes, however, that the plea agreement's ceiling operates only so long as the Court does not itself depart downward in the offense level or criminal history category. Id. Should the Court depart or vary below the Guidelines range, the government reserves all rights under the plea agreement.

### D.    The Guidelines Range Already Reflects Full Mitigation

One hundred months represents a sentence that already incorporates every available Guidelines reduction: a two-level minor role adjustment, a two-level safety valve reduction, a three-level acceptance of responsibility reduction, and the benefit of the 2025 Guidelines amendments that reduced both the base offense level and criminal history category. The advisory range dropped from 151-188 months under the original PSR to 100-125 months under the RPSR – a reduction of more than four years at the low end, attributable entirely to legal and policy changes, not to anything Defendant did.

The defense will ask the Court to go even further still. It should not. The Guidelines have already given Defendant everything they can give. What remains is a sentence that reflects who he is and what he has done – and on that record, 100 months is not excessive. It is the minimum fair recommendation that accords with the parties' plea agreement.

**IV.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

The Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). Those purposes – the nature and circumstances of the offense, the history and characteristics of the defendant, the need for just punishment, deterrence, protection of the public, and the avoidance of unwarranted sentencing disparities – all point in the same direction here. A sentence of 100 months is not merely justified by the § 3553(a) factors. It is compelled by them.

**A.    Nature and Circumstances of the Offense (§ 3553(a)(1))**

This was not a user's transaction. It was not an impulsive mistake. It was a professionally organized, cross-border narcotics distribution operation, and defendant was its ground-level executor.

On October 16, 2015, Defendant and his partner, RM, directed a drug-laden vehicle into a private garage, sent the driver inside, and set to work extracting 18 packages of methamphetamine from a custom-built false compartment concealed beneath the center console of an Audi A4. (RPSR ¶ 17.) The compartment contained 6,169 grams of methamphetamine tested at 100% purity. Id. Six kilograms of methamphetamine at maximum purity, hidden in a purpose-built concealment infrastructure, transported across the United States border by a recruited driver operating under the direction of a

10

supply chain coordinator – this is the architecture of a transnational criminal organization, not the side deal of an addict. (RPSR ¶ 18.)

The defense's 2026 sentencing memo describes the instant offense as the act of a passive drug addict who "realized it was a drug deal, and continued moving forward." (Dkt. 493 at p. 3.) Defendant provided that account to the United States Probation Office during his recent interview via telephone on February 26, 2026. (RPSR ¶ 21.) It is **directly and materially contradicted** by what Defendant told federal agents and a federal prosecutor under proffer on March 23, 2022 – a meeting which defense counsel attended as well.[2]

The proffer tells a materially different story – and it is Defendant's own account. Defendant knew there would be narcotics in the vehicle before he agreed to proceed. He inferred it from RM's insistence on finding an isolated location, and he agreed to continue in exchange for cash. (Ex. 3 at ¶ 4.) He personally participated in contacting HQ to arrange the use of the garage. (Id.) He drove with RM in a Land Rover to meet the Audi at a gas station and directed the driver to HQ's residence. (Id. at ¶6.) When the vehicle's instrument panel showed signs of tampering, he and RM drove to O'Reilly Auto Parts to purchase tools to open the compartment. (Id. at ¶ 7.) He felt he was being followed by law enforcement – and he continued anyway. (Id.)

---

[2] The government's March 23, 2022 proffer report is filed herewith as a sealed exhibit pursuant to the Court's June 28, 2022 Protective Order (Dkt. 121), which expressly authorizes the use of confidential materials in sentencing proceedings. (Dkt. 121 ¶ 6(g).) The government references its substance in this filing and files the exhibits under seal consistent with the requirement to limit public disclosure of protected information. (Dkt. 121 ¶ 6(o).)

These two accounts – the one given to probation less than two months ago and the one given under proffer to federal agents in March of 2022 – cannot both be true. Either Defendant told the Probation Office a false and minimized account of his conduct in order to obtain a more favorable sentence recommendation, or he told federal agents a false account during his proffer session. One of those statements is a lie. The defense is now asking this Court to sentence Defendant based on the version he gave to Probation – the version that minimizes, that strips out the garage arrangement, the escorted vehicle, the tool purchase, the continued conduct under suspected surveillance. The Court should instead credit the account Defendant gave in the presence of Mr. Wallach when he believed it was in his interest to be forthcoming with federal law enforcement – and evaluate the § 3553(a) factors against the complete record. The government does not seek to litigate the parties' agreed Guideline calculations or the minor role adjustment as reflected in the RPSR. It presents the proffer record as directly relevant to the § 3553(a) factors – specifically, to the nature and circumstances of the offense, the history and characteristics of Defendant, the credibility of the sentencing narrative now advanced by defense.

What that record shows is this: Defendant did not stumble into a drug deal. He arranged the garage. He escorted the vehicle. He purchased the tools. He pressed forward when he suspected law enforcement was watching. He was a knowing, active, and trusted operator in a coordinated narcotics operation – and he has told two materially inconsistent stories about it to two separate arms of the federal government.

12

The quantity and purity of the drugs establish the gravity of this offense independently. At 100% purity, 6,169 grams of methamphetamine is not diluted street product. It is wholesale supply – capable of being cut, packaged, and distributed to thousands upon thousands of individuals in American communities. The false compartment, the recruited international driver, the coordinated operation, and the Tijuana supply chain reflect planning and operational sophistication that define professional narcotics trafficking at the wholesale level.

The nature and circumstances of this offense, properly understood from the full and uncontradicted record, weigh heavily in favor of a Guidelines sentence.

**B.    History and Characteristics of Defendant (§ 3553(a)(1))**

The defense characterizes Defendant's criminal history as the record of a non-violent drug addict. In both its 2022 and 2026 sentencing submissions – filed four years apart, by the same counsel – the defense presented identical descriptions of Defendant's criminal history, omitting the same offenses, deploying the same framing, and reaching the same conclusion: that his convictions are "not violent crimes and are "associated with non-violent drug addicts." (Dkt. 493 at p. 13.) That characterization was incomplete in 2022. In 2026, with the proffer record before the Court, it is not merely incomplete. It is contradicted – by Defendant's own words.

The complete record is as follows.

In **2000** (age 22), defendant was convicted of **carrying a loaded firearm in a public place** in Orange County, receiving three years' probation and 15 days jail. (RPSR ¶ 46.) This offense predates any drug conviction by five years. It is not an addiction offense. It is

13

a weapons offense – omitted entirely from every defense account of his criminal history filed in this case.

In **2005** (age 27), Defendant was convicted in Tulare County of four counts arising from a single arrest: **Driving Under the Influence; Being Under the Influence of a Controlled Substance; Possession of Controlled Substance Paraphernalia;** and **Possession of a Switchblade Knife**. (RPSR ¶ 47.) He received 120 days' jail and 36 months' probation. The defense characterizes this as a drug conviction. It also was a weapons conviction – the second weapons-related conviction in his record, again absent from every defense account filed in this case.

In **2006** (age 27), Defendant was convicted of **Driving with a Suspended License with a Prior Conviction**, receiving 60 days' jail. (RPSR ¶ 48.)

In **2008** (age 28), Defendant was again convicted of **Driving with a Suspended License**, receiving 30 days' jail. (RPSR ¶ 49.)

In **2010,** (age 32), Defendant incurred two separate convictions. First, a felony conviction for possession of methamphetamine in Tulare County, receiving three years' probation. (RPSR ¶ 50.) Second – omitted entirely from the defense's account in both its 2022 and 2026 filings – a conviction in San Bernardino County for **Giving a False Identity to a Peace Officer**, receiving 10 days' jail. (RPSR ¶ 51.) This is not an "addiction offense." It is a deliberate act of deception directed at a law enforcement officer. It is the first of three documented instances where Defendant provided false identities to officers over three decades – a pattern the defense has never acknowledged and that this Court has never been asked to consider.

14

In **2013** (age 35), Defendant was convicted in San Bernardino County for **Felony Possession of a Controlled Substance for Sale**, receiving six months' jail and 36 months' probation. (RPSR ¶ 52; Ex. 1.) When arrested, he gave the arresting officer a false name – "Demetrio Gonzalez." (Ex. 1.) This is the second documented instance of lying to law enforcement. The court dismissed a separate count charging transportation and sale of a controlled substance – meaning the underlying arrest was more serious than the conviction reflects. (Id.) He was placed on probation. Two years later, while on that probation, he committed the instant offense.

In **2015**, while on active probation / supervision, he **conspired to unload more than six kilograms of pure methamphetamine**, the facts underlying this conviction. He has given two materially inconsistent accounts of his role in it, as described above.

In **2019** (age 41), he was convicted of felony **Transportation and Sale of a Controlled Substance**. On May 29, 2019, Defendant was stopped by a California Highway Patrol Officer, after which law enforcement discovered 27 packages of methamphetamine totaling approximately 27 pounds in the trunk of his vehicle, along with $1,174 in cash on Defendant's person. (Ex. 2.) When taken into custody, Defendant gave a false name – "Miguel Hernandez Nava" – the third documented instance of lying to law enforcement. (Id.) He freed himself from handcuffs and fled the scene. Id. He was apprehended, convicted, and sentenced to three years' county jail and four years' mandatory supervision. (RPSR ¶ 53.)

Defendant's sentencing position describes this conviction as one of a series of non-violent crimes associated with non-violent addicts. Once again, that characterization is directly contradicted

15

by Defendant's own words given under proffer. At the March 23, 2022 proffer session, Defendant told federal agents that his West Valley Detention Center incarceration arose from trafficking multi-pound quantities of crystal methamphetamine; that he was engaged in trafficking for approximately two months; that he had transported narcotics on approximately five to six separate occasions; that he and RM knowingly processed a multi-kilogram amounts of methamphetamine; and that he was paid approximately $1,000 per delivery. (Ex. 3 at ¶ 9.)

Once again, two accounts exist of the same conduct. The account given to the Probation Office – and now presented to this Court – describes a non-violent addict's minor offense. The account given under proffer to federal agents describes a two-month, multi-delivery, paid narcotics enterprise: processing methamphetamine at a residence with his co-conspirator, transporting it on five or six occasions, collecting $1,000 per run. Those two accounts cannot both be true. Either Defendant lied to the Probation Office about the nature and scope of his 2019 conduct in order to minimize his exposure at sentencing – or he lied to federal agents during his proffer. One of those statements is false. What is beyond dispute is that Defendant has provided materially inconsistent accounts of two separate criminal episodes to two separate arms of the federal government, and that on both occasions the more detailed, specific, and operationally corroborated account is the one given under proffer – not the one his counsel is now urging this Court to credit.

This Court is not required to accept the version of events most favorable to Defendant. It has the complete record. That record establishes the following: a man with two weapons convictions

16

spanning 2000 and 2005; a documented pattern of lying to law enforcement on three separate occasions across nearly a decade in 2010, 2013, and 2019; a 2013 trafficking-for-sale conviction with a dismissed transportation count; a 2015 federal conspiracy offense committed while on probation for a 2013 drug trafficking conviction; and a sustained two-month trafficking enterprise involving five or six deliveries.

The defense's selective and materially inconsistent presentation of this history does not constitute mitigation. It is the latest iteration of a pattern this Court has now seen across every stage of this litigation: a defendant and his counsel who present the version of events most favorable to the defense, omit material events when inconvenient, and ask this Court to act on an incomplete or misrepresented record. The § 3553(a) factors require that the record be considered in full.

### C. Need for Just Punishment and Respect for the Law (§ 3553(a)(2)(A))

A sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2). On each measure, 100 months is the minimum that suffices.

The instant offense involved more than six kilograms of 100% pure methamphetamine, concealed in purpose-built infrastructure, transported across an international border as part of a coordinated criminal supply chain. The Guidelines – already revised substantially downward – still produce a range of 100 to 125 months. That range reflects the Sentencing Commission's considered judgment, informed by national data and experience, about the appropriate punishment for

this conduct by a defendant with this history. Its judgment is entitled to respect.

Defendant has been convicted of drug trafficking offenses three times. He has received probation, county jail, and mandatory supervision at the state level. None of it has promoted respect for the law. A sentence of 15 months would communicate to this Defendant, and to every similarly situated repeat trafficker, that a career of methamphetamine distribution carries no meaningful federal consequence. That is not just punishment. That is abdication of the purposes of § 3553(a)(2)(A).

Defendant also stands before this Court having provided materially inconsistent accounts of his own conduct to the Probation Office and/or to other federal law enforcement agents. A sentence at the Guidelines floor is the appropriate response to a record that includes not only repeated trafficking but a demonstrated willingness to misrepresent that conduct to the institutions tasked with evaluating it. Defendant agreed, as part of his plea, to be truthful at all times with the Probation Office and the Court. (Dkt. 95 ¶ 2(g).) The record raises serious questions about whether that obligation has been honored. Respect for the law begins with telling the truth to the Courts and the officers charged with administering justice. The § 3553(a)(2)(A) factors weigh heavily toward a sentence at the Guidelines floor – 100 months.

That sentence reflects the gravity of the offense, the pattern of conduct surrounding it, and what justice requires when this Court finally reaches a sentence for a career trafficker on his third similar conviction.

18

**D.    Deterrence and Protection of the Public (§ 3553(a)(2)(B))**

The record on specific deterrence is unambiguous and unbroken: nothing short of incarceration has worked.

Defendant's 2013 trafficking conviction resulted in probation. He was back trafficking at most two years later, while on that probation, in the instant offense. His arrest in this case came in December 2020. By his own proffer admission, following his arrest in this case, he ran a two-month trafficking operation involving at least five to six deliveries, on site-processing with his co-conspirator, and $1,000 per run. (Ex. 3 at ¶ 9.) He did not stop.

A sentence of 100 months provides specific deterrence commensurate with a pattern that has proven impervious to every lesser intervention across years of documented trafficking activity. A sentence of 15 months – or even Probation's recommended 48 months – simply repeats the same failed formula on a marginally longer timeline. This Defendant has demonstrated through numerous convictions and his own proffer admissions that he does not stop until he is incarcerated.

The need for general deterrence is equally compelling. The instant offense was part of a transnational methamphetamine trafficking network operating across the United States-Mexico border, supplied from Tijuana, using recruited drivers, and concealment infrastructure. It moved wholesale quantities of 100% pure methamphetamine into American communities. (RPSR ¶ 18; Ex. 3 ¶¶ 4-7.) A guidelines sentence for a repeat trafficker operating at this level sends a necessary and proportionate message that federal prosecution of cross-border narcotics trafficking carries real and substantial consequences. A variance to 15 months sends precisely the opposite

19

message – that a career trafficker with three convictions, who ran a second trafficking enterprise after being arrested for this offense, can expect a sentence that amounts to time-served in exchange for "sympathetic" post-deportation circumstances that this Court has already deemed to be the foreseeable result of Defendant's own conduct. (Dkt. 478 at pp. 5-6.)

General deterrence demands more.

### E.    Protection of the Public (§ 3553(a)(2)(C))

The record establishes a single, consistent pattern: when Defendant is not incarcerated, he traffics methamphetamine.

His criminal career is well-documented above. The defense will argue that Defendant is now reformed – that years of pretrial sobriety and employment demonstrate he is no longer a danger. The record answers that argument with Defendant's own words. The various narratives describe two different men. The Court is not required to guess which one is real. Defendant's own account, corroborated, answers that question.

There is no Guidelines adjustment, no variance rationale, and no sympathetic post-conviction circumstance that changes what the record shows: this Defendant poses a demonstrated and ongoing risk to public safety through large-scale methamphetamine distribution.

### F.    Avoiding Sentence Disparities (§ 3553(a)(6))

A sentence at the low end of the Guidelines range is, by definition, the Sentencing Commission's considered judgment about what the appropriate sentence is for a defendant with this offense level and criminal history. It is not an outlier. It is the floor of what the Guidelines – already revised substantially downward through

policy changes that had nothing to do with Defendant's conduct – say is appropriate for this conduct and this record.

A sentence of 15 months – or even Probation's recommended 48 months – would create a significant and unwarranted disparity with similarly situated defendants across the country. Defendants who conspire to distribute multi-kilogram quantities of 100% pure methamphetamine, who have prior trafficking convictions, who committed additional trafficking enterprises while on supervision, who provided materially inconsistent accounts of their conduct to federal authorities, and who gave false identities to law enforcement on numerous occasions do not receive sentences of 15 or 48 months. They receive Guidelines sentences. To sentence this Defendant to 15 or 48 months would be to treat him far more favorably than Defendants with less serious records, less aggravated conduct, and cleaner presentations to the Court – not because the Guidelines warrant it, but because the circumstances of a deportation this Court has found to be lawful and foreseeable have generated sympathy that the complete § 3553(a) record does not support.

The avoidance of unwarranted disparities requires a sentence at the Guidelines floor. One hundred months is that sentence. Anything less creates a disparity – and does so on a record that provides no legitimate basis for it.

**V.    RESPONSE TO DEFENSE SENTENCING POSITION**

**A.    Preliminary Note: The Cooperation Narrative Is Public**

Defense counsel has communicated his objection to public disclosure of cooperation-related information, noting that his public sentencing filing was deliberately stripped of such detail for

21

claimed safety reasons.[3] The government respects that Defendant filed a truncated public version of his sentencing papers; however, the cooperation narrative is no longer confidential – and that is not the government's doing.

On April 5, 2026, days before Defendant's sentencing papers were filed, the Los Angeles Times published a front-page story identifying Defendant by the name on these pleadings as a cooperating witness. The article describes his cooperation with federal prosecutors in detail, references a threatening message he received, and reports the acquittals that followed his deportation.[4] The story was based on an interview with Defendant and his wife, and on emails between counsel disclosed to the news outlet by the defense. Defendant gave a detailed video interview to a national newspaper. That was his right. But he cannot now invoke safety concerns to prevent the government from responding in a court filing to arguments he has already made publicly – to a journalist. The government addresses the cooperation narrative to the extent necessary to respond to the arguments in Defendant's sealed submission. Confidential materials are filed under seal consistent with the Court's Protective Order (Dkt. 121 ¶¶ 6(g), 6(o)) and the Court's standard practices.[5]

---

[3] In email correspondence on April 13, 2026, defense counsel, notwithstanding the Los Angeles Times Article, indicated that he objected to a public disclosure of information within this filing, requesting that information related to the "substance and extent" of Defendant's prior cooperation.

[4] James Queally, "He Was Willing to Testify Against the Cartel. ICE Got to Him First." L.A. Times. Apr. 5, 2026 (available at: https://www.latimes.com/california/story/2026-04-05/ice-los-angeles-drug-trafficking-witness-deported)

[5] The proffer report, Exhibit 3, and the threat email, Exhibit 5, are filed herewith as sealed exhibits. The proffer report is the government's own law enforcement document – a DEA-6 authored by the case agent – and is

*(footnote cont'd on next page)*

**B.     Four Years, Two Stories, One Defendant**

The defense's newest sentencing position rests on a narrative that did not exist when the facts were fresh.

In February 2022, defense counsel filed a sentencing memorandum, later withdrawn at defense counsel's request when sentencing was continued.[6] (Dkt. 102 (withdrawn).) That document described Defendant as a passive drug addict who stumbled into a drug deal for a couple hundred dollars, realized what was happening, and got arrested. (Id.) That account sought 60 months. (Id.) The Guidelines range at the time was 151 to 188 months. (Id.; see also PSR.)

Four years later, the Guidelines have dropped to 100 to 125 months – through policy changes unrelated to this Defendant. (See generally RPSR.) And Defendant's ask has gone from 60 to 15 months – an additional 45-month reduction on top of the Guidelines windfall, based entirely on a narrative that was not in the 2022 filing: that Defendant is a courageous cooperating witness living in cartel-imposed exile whose inability to appear for sentencing is entirely the government's fault. (Dkt. 493 at pp. 12-13.) The facts of the offense did not change. The criminal history did not change. The narrative changed – strategically, dramatically, and in ways that are directly contradicted by the record.

---

expressly authorized for use at sentencing under the terms of the proffer agreement. The government expressly reserves all rights with respect to any disclosure of sealed or protected materials to members of the press.

[6] Defendant's 2022 sentencing memorandum, (Dkt. 102), was voluntarily withdrawn by defense counsel solely to permit an updated filing closer to the rescheduled sentencing date – not for any substantive reason and not stricken for cause. The government cites it as evidence of the evolution of Defendant's sentencing narrative, which is directly relevant to the credibility of the positions now advanced in his 2026 submission.

The Court has before it two distinct accounts of Defendant's conduct – one given to the Probation Office, one given under proffer to federal agents. They are irreconcilable. As set forth in detail in Section IV above, Defendant cannot escape that inconsistency. If the Probation account is false, he violated his plea agreement's truthfulness obligation. (Dkt. 95 at ¶ 2(g).) If the proffer account is false, he made a materially false statement to federal agents. Either way, this Court should not sentence Defendant based on the version of events most favorable to him when the record contains a directly contradictory account given under proffer – an account corroborated by his 2019 arrest report, his conviction, and his three-year county jail sentence. Defendant's 2026 narrative is not mitigation. It is revision and misrepresentation. And it is in service of a request for a sentence that would be remarkable for a first-time offender – indefensible for a three-time convicted methamphetamine trafficker whose own proffer admissions describe two sustained trafficking enterprises.

The same irreconcilable inconsistency exists with respect to the 2019 offense, as set forth in Section IV.B above.

**C.    The Guidelines Have Credited Every Available Mitigation**

The defense argues for consideration of its exceptionally low sentencing request based on Defendant's "minor involvement," (Dkt. 493 at p. 20), and even for a "substantial downward variance" for his acceptance of responsibility, (Id. at pp. 11-12). Each of those adjustments is already reflected in the calculation. They are reflected in the RPSR's total offense level of 25. (RPSR at p. 3.) They produced a range from 100 to 125 months – down from 151 to 188 months under the original PSR. (Compare PSR with RPSR.) The

24

Guidelines did not ignore these factors. They accounted for them precisely, and they produced a range the Sentencing Commission determined is appropriate for this conduct and history.

The defense also argues that Criminal History Category V overstates Defendant's danger because his convictions are non-violent. (Dkt. 493 at pp. 13-15.) That argument ignores the loaded firearm conviction in 2000. (RPSR ¶ 46.) It ignores the switchblade conviction in 2005. (RPSR ¶ 47.) It also ignores the false identity conviction in 2010. (RPSR ¶ 51.) It neglects to mention the proffer-confirmed scope of the 2019 trafficking enterprise. (Ex. 3, ¶ 9.) And it ultimately ignores that Criminal History Category V already reflects the 2025 Guidelines amendments that eliminated status points in Defendant's favor. (Dkt. 486 (First Addendum to the RPSR) at p. 1.) The Guidelines have given Defendant every reduction available. A further variance is plainly unwarranted.

Probation's 48-month recommendation, (Dkt. 484 at p. 1), warrants respect but does not account for the complete record. Probation prepared its recommendation based on Defendant's presentence interview account – the same account directly contradicted by his proffer to law enforcement. (Compare RPSR ¶ 21; Ex. 3.) The government submits that the 48 month recommendation does not adequately reflect the aggravating factors now before this Court.

**D.    The Deportation Circumstances Do Not Warrant a Variance**

This Court has ruled on the deportation – twice – and both times against Defendant. Defendant's removal was lawful, foreseeable, and explicitly addressed in the plea agreement and his Rule 11 colloquy. (Dkt. 478 at pp. 5-7; Dkt 489 at pp. 5-6.) The motion to dismiss was denied. (Dkt. 478.) The motion to set aside the plea was denied.

(Id.) The motion for reconsideration was denied as untimely, substantively meritless, and procedurally defective. (Dkt. 489.) Those rulings are final. Defendant's repeated unwillingness to accept them and relitigate the deportation circumstances – now repackaged as a § 3553(a) variance argument, (Dkt. 493 at p. 20), does not become more persuasive through repetition or relabeling.

On February 3, 2026, defense counsel filed an ex parte application declaring that Defendant "has made the voluntary choice to return to the United States for sentencing." (Dkt. 481 at 3, ¶ 4.) The Court relied on that declaration in denying the motion for reconsideration. (Dkt. 489 at p. 7.) Parole authorization has been secured for the April 16, 2026 hearing. (Ex. 4.) The path to appear is open. Defense counsel is ethically obligated to inform Defendant of the parole opportunity and sentencing date. (Dkt. 478 at p. 11, n.8.) (citing Cal. Bus. & Prof. Code § 6068(m); Cal. Rules of Prof. Conduct R. 1.4(a)(3)). If Defendant does not appear on April 16, his absence will be voluntary – made after an affirmative representation to this Court that he intended to return. The government reserves all rights in that event. (See Dkt. 480 (Notice of Anticipated Sentencing Procedure).)

**E.    The § 5K1.1 Argument Fails And the Threat Was Non-Credible**

Defendant argues that the government's decision not to file a §5K1.1 motion is arbitrary under United States v. Murphy, 65 F.3d 758, 762 (9th Cir. 1995), and that this Court should depart downward sua sponte under United States v. Treleaven, 35 F.3d 458, 462 (9th Cir. 1994). (Defendant's under-seal sentencing filing ("Sealed Sent.

26

Memo") at pp. 18-19).[7] That argument fails on the law, on the facts, and on a record that Defendant has never presented to this Court.

On the law, the filing of a § 5K1.1 motion rests solely on the discretion of the government. <u>Wade v. United States</u>, 504 U.S. 181, 185-86 (1992). A court may inquire upon a substantial threshold showing that the refusal was based on an unconstitutional motive. <u>Id.</u> Defendant has made no such showing. Baseless speculation about litigation adversity, the disposition of co-defendants, or his client's failure to return to testify does not constitute evidence of unconstitutional motive. Murphy requires that the government's refusal be irrational or unconstitutional – it is neither. A <u>Treleaven</u> departure is also unavailable absent a finding of bad faith or unconstitutional motive that the record cannot support.

On the facts, Defendant never completed his cooperation at the jury trial of his co-defendants. His cooperation was meant to culminate at testimony at trial, not produce new information on other cases. He chose, despite being given authorization to enter the United States, not to testify. He did so knowing that he would not be able to receive cooperation credit, following the trial – regardless of its outcome. Ultimately, no substantial assistance was rendered to the United States. A § 5K1.1 motion rewards actual, completed assistance that benefits the government. When the case ends and the cooperating witness never takes the stand, the substantial assistance calculus is materially different than the other eventuality. The

---

[7] As of the date of this filing, Defense's under-seal sentencing memorandum has not been docketed. The references cited therein, reviewed by the government, contain no information that would be reasonably subject to an under-seal filing, and the government objected to the Defendant's under-seal filing.

government's decision is rationally grounded in those facts. Defendant exercised his right not to ultimately testify. He did so with eyes open to the consequences. Defendant is not entitled to credit for cooperation that he declined to give.

Regarding the "threat" that Defendant uses as the emotional core of Defendant's § 5K1.1 sua sponte variance argument, Mr. Wallach never discloses this threat to the Court. The government does so now, under seal as Exhibit 5. On June 21, 2022, the case agent reported the results of a brief inquiry to the then-assigned AUSA in a written communication. (Ex. 5.) The case agent conducted a reverse image search on the photographs contained in the purported threatening message. His findings are recounted in Exhibit 5; however, they are in sum: that the photos were taken off the internet, unrelated to Defendant or the Sinaloa cartel and were not relevant to Defendant or the case. Ultimately, the case agent believed they were sent to Defendant "to feign as a credible threat." (Id.) That sole feigned communication, years prior to Defendant's 2026 sentencing papers, and in a case where another cooperator testified freely and without fear, vitiate Defendant's claim to a sua sponte § 5K1.1 credit. The 5K1.1(a)(4) variance argument invoked by Defendant requires "injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance." U.S.S.G. § 5K1.1(a)(4); United States v. Ressam, 593 F.3d 1095, 1125 (9th Cir. 2010). The sole "threat" that forms the basis of that argument was isolated, years ago, an email communication, and was assessed to be fabricated by the case agent. The factual predicate for a variance, even if it were offered by the government, does not exist.

The government declines to file a § 5K1.1 motion. That decision is final, rationally grounded, and not subject to judicial override on this record. The Court should impose the sentence without a sua sponte departure on that basis.

**F.    Defense's Repeated Disclaimers of Responsibility**

Defense counsel also argues, despite the Court's clear ruling (Dkt. 478), that the parole remedy is inadequate because the government did not provide him with funds and lodging to travel to a port of entry. (Dkt. 493 at pp. 8-11.) That argument borders on the absurd. The government secured lawful authorization for a convicted drug trafficker – who has been the subject of a final order of removal since 2019, who has never been lawfully present in the United States, and who is currently residing in Mexico – to reenter the United States lawfully for the purpose of attending his own sentencing hearing – something he expressly agreed to do in his plea agreement. (See generally Dkt. 95; Ex. 4.) The parole authorization is valid for several weeks and permits entry at any port of entry. Ex. 4. Defendant is a 48-year old man who, by his own account, is employed, has maintained contact with his probation officer and defense counsel, and arranged his own housing and employment in Mexico following deportation. (RPSR ¶ 64, 96.) The suggestion that the government would be obligated to additionally fund and arrange his travel to the border – for a sentencing hearing on charges arising from his own criminal conduct – has no basis in law, in the plea agreement, or in basic reason. Defendant does not need a travel agent. He needs to choose to appear. He has authorization to do so lawfully. Defense counsel represented that he would. (Dkt. 481 at p. 3.) Whether Defendant honors it is his choice alone.

**VI.   PROCEDURAL POSTURE IN CASE OF NON-APPEARANCE**

The government's procedural posture in the event of Defendant's non-appearance is on file. (Dkt. 480.) Parole authorization is effective and valid. (Ex. 4.) Defense counsel is ethically obligated to inform Defendant of the opportunity and sentencing date. (Dkt. 478 at p. 11, n.8.) Defense counsel represented that Defendant will knows about the sentencing date and will attend. (Dkt. 481 at p. 3.) If defendant appears, the government is prepared to proceed. If he does not, his absence will be voluntary. The government will address the appropriate course consistent with its prior filings.

**VII. RESERVATION OF THE GOVERNMENT'S RIGHT TO DECLARE BREACH**

The government expressly reserves the right to declare a breach of the plea agreement, (Dkt. 95), at any lawful time, including on the grounds of Defendant's failure to appear at his sentencing hearing in violation of ¶ 2(d), Defendant committing any crime (e.g. 18 U.S.C. § 1001) in violation of ¶ 2(f), Defendant's failure to be truthful with the United States Probation Office or the Court in violation of ¶ 2(g), or any other knowing violation of Defendant's obligations under the agreement. The government's election to proceed under the plea agreement at this time constitutes no waiver of any breach ground, and the government reserves the right to revise its sentencing position should breach be declared.

**VIII.   GOVERNMENT'S RECOMMENDATION AND CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court sentence Defendant to 100 months' imprisonment, five years of supervised release, and a mandatory special assessment of $100.